

The following constitutes
the order of the court. Signed August 24, 2016

_____
Charles Novack
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>JUAN ANTONIO RAMIREZ,<br><br>    Debtor. | Case No. 15-41511 CN<br><br>Chapter 7 |
| LABOR COMMISSIONER, STATE OF CALIFORNIA,<br><br>    Plaintiff,<br>vs.<br><br>JUAN ANTONIO RAMIREZ,<br><br>    Defendant. | Adversary No. 15-4083<br><br>**MEMORANDUM AFTER TRIAL** |

On July 12 and 13, 2016, this court conducted a trial in the above adversary proceeding. All parties were represented by counsel. Plaintiff Labor Commissioner of the State of California (the "Labor Commissioner") asserts that defendant Juan Antonio Ramirez ("Ramirez") failed to pay Luis Juarez $23,924.01 in wages and related statutory interest, damages and penalties, and that Ramirez cannot discharge this debt under Bankruptcy Code § 523(a)(2)(A), (a)(4), and (a)(6). The Labor Commissioner contends that he is the assignee of this claim. Juarez's wage claim was established during an administrative hearing before the State of California's Department of Industrial Relations. The results of this administrative hearing (during which both Ramirez and Juarez testified) are contained in a November 22, 2013 Order and Award of the State of California Labor Commissioner (the "November 22nd Order"), which became an Alameda County Superior Court judgment on

1

January 9, 2014. Ramirez, a licensed California contractor who routinely hires periodic laborers such as Juarez, contends that his failure to pay Juarez's wages is a dischargeable breach of contract claim. The following constitutes this court's findings of fact and conclusions of law under Federal Rule of Bankruptcy Procedure 7052.

**A. The Fraud Claim For Relief Under § 523(a)(2)(A)**

Ramirez is a licensed California contractor whose primary source of income in 2013 was from renovation work performed for REO Homes ("REO"). Ramirez routinely hired day laborers or periodic workers to perform the REO renovation work. Luis Juarez was one of those periodic workers. The basic terms and scope of Juarez's employment were established by the November 22nd Order.[1] The November 22nd Order states in pertinent part that Ramirez employed Juarez from March 25, 2013 to September 13, 2013. Ramirez initially agreed to pay Juarez $100 per day, and then increased the daily rate to $120 starting on June 1, 2013. During this time, Juarez worked at several job sites, and did carpentry work, painting, some demolition work, and light construction. Ramirez paid Juarez by check and cash. From March 25, 2013 through May 31, 2013, Juarez earned $6,000.00 but only received $3,600.00 from Ramirez. From June 1, 2013 through August 20, 2013, Juarez earned $8,640.00 but only received $2700 from Ramirez.[2]

Juarez testified that he was paid once a week, typically on Friday, and that he was timely and fully paid for only the first few weeks of work. By May 2013, Ramirez was not making full payments to Juarez. Juarez testified that he complained to Ramirez each time he was not paid in full. Ramirez typically responded by informing Juarez that REO was not timely paying him, and that he would pay Juarez when REO paid him.

Juarez worked on several REO renovation projects for Ramirez. He was not Ramirez's sole employee; several other persons worked for Ramirez on his REO projects. The checks introduced

---

[1] This court determined that Ramirez was bound (by the doctrine of issue preclusion) to the November 22nd Order's findings regarding the terms of Juarez's employment and his payment history.

[2] The November 22nd Order did not explain why Juarez was not entitled to compensation from August 20, 2013 through his September 13th termination date.

2

into evidence indicate that Ramirez had numerous REO projects during Juarez's employment. While it is unclear exactly which projects Juarez worked on, by mid June 2013 Juarez was working on a REO renovation project known as the 14th Street project (the "14th Street project"). Juarez only received intermittent payments for his work on the 14th Street project, and his complaints were met with Ramirez's standard refrain: that REO was not timely paying him, and that he would pay Juarez when REO paid him for the 14th Street project work. Juarez testified that he accepted and relied on Ramirez's statements, and that he would not have continued to work for Ramirez without these repeated assurances of payment. Ramirez is married, has three children, and is the family's primary wage earner.

Ramirez did not fully pay Juarez for his work on the 14th Street project. Juarez worked at the 14th Street project through August 25, 2013, and only received two paychecks for this work: a June 17, 2013 check for $700, and a June 29, 2013 check for $700.[3] Moreover, despite his representations to Juarez, REO fully paid Ramirez on all of its contracts with him, including the work performed at the 14th Street project. And there is no credible evidence that any of REO payments were late. Starting in March 2013, REO paid Ramirez $39,120.00 for work performed on the 14th Street project. Ramirez received weekly checks from REO from March 15th through April 15, 2013, which totaled $28,695.00. Given the statements in the checks' "memo" area, these checks represented payment for Ramirez's initial work on the 14th Street project. REO did not issue its next 14th Street project check, however, until May 10, 2013 (for $8,625.00), and it made its final payment to Ramirez on the 14th Street project more than two months later on July 29, 2013 (1800.00).

Ramirez testified that REO was displeased with the lack of progress on the 14th Street project, and that REO repeatedly informed him that he would be terminated from the 14th Street project if the pace of work did not accelerate. While Ramirez did not state when REO first warned him, the pause in check payments strongly suggests that he knew that the 14th Street project was in jeopardy by June 2013. Despite this, Ramirez continued to inform Juarez that he could not pay him due to REO's

---

[3] Notwithstanding the November 22nd Order's finding that Juarez received $6,600.00 in wages from Ramirez, the parties only introduced five paychecks into evidence which totaled $3,080.00. Only two of these checks were for Juarez's work on the 14th Street project.

3

**MEMORANDUM AFTER TRIAL**

failure to timely pay him, and that he would cure the wage arrears when he was paid.

REO terminated Ramirez from the 14th Street project on August 25, 2013, and there is no evidence that REO hired him as a general contractor on any future renovation projects. Juarez filed his wage complaint before the Labor Commissioner a few weeks earlier, on August 5th. Ramirez fired Juarez when he learned of the wage complaint in early September.[4]

Bankruptcy Code § 523(a)(2)(A) provides that "A discharge . . . does not discharge an individual debtor from any debt . . . (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by - (A) false pretenses, a false representation, or actual fraud[.]" A creditor must establish five elements by a preponderance of the evidence to prevail on a § 523(a)(2)(A) claim: (1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of the statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by his reliance on the debtor's statement or conduct. *Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman),* 234 F.3d 1081, 1085 (9th Cir. 2000). A § 523(a)(2)(A) claim may also arise from the concealment or intentional non-disclosure of material facts. *In re Evans*, 181 B.R. 508, 515 n.6 (Bankr.S.D. Cal.1995). A debtor's knowledge and intent to deceive may be inferred by circumstantial evidence and from the debtor's conduct. *Edelson v. CIR*, 829 F.2d 828, 832 (9th Cir. 1987); *Donaldson v. Hayes (In re Ortenzo Hayes)*, 315 B.R. 579, 587 (Bankr. C.D. Cal. 2004). A § 523(a)(2)(A) claim requires that the "target misrepresentation must have existed at the inception of the debt, and a creditor must prove that he or she relied on that misrepresentation." *Reingold v. Shaffer (In re Reingold)*, 2013 WL 1136546, at *5 (B.A.P. 9th Cir. Mar. 19, 2013); *see also, New Falls Corp. v. Boyajian (In re Boyajian),* 367 B.R. 138, 147 (B.A.P. 9th Cir. 2007) (*citing Bombardier Capital, Inc. v. Dobek (In re Dobek)*, 278 B.R. 496, 508 (Bankr.

---

[4] The parties dispute the circumstances of Juarez's firing. The Labor Commissioner contends that REO hired Ramirez to work on a project at 2825 Vallecito in September 2013, and that Ramirez fired Juarez when he showed up for work at that project. Ramirez denies that REO hired him to work on 2825 Vallecito, since the project required a commercial contractor's license which he lacked. While REO reimbursed Ramirez for the cost of obtaining permits for 2825 Vallecito, there is no evidence that he was hired for that project.

4

**MEMORANDUM AFTER TRIAL**

N.D. Ill.2002)). Finally, the Labor Commissioner must prove his non-dischargeability claim for relief by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

The Labor Commissioner has met his burden of proof with regard to some of the missed wage payments. Juarez worked on several REO renovation projects for Ramirez. The Labor Commissioner has not demonstrated by a preponderance of the evidence that Ramirez's *early* representations to Juarez that REO was not timely paying him and that he would catch up on his wages were made with the intent to deceive. Simply, the Labor Commissioner did not establish that Ramirez's intentional misrepresentations began the first time he defaulted on Juarez's paycheck. Nor could Juarez pinpoint or state with sufficient specificity which weeks Ramirez failed to fully pay him. Ramirez had numerous REO contracts during most of Juarez's employment, and it appears that Ramirez may have used proceeds from projects that Juarez did not work on to pay for Juarez's wages. Ramirez's REO contracts petered out, however, in June and July, which reduced the money that Ramirez could use to pay Juarez's accrued (and ongoing wages). Ramirez's Bank of America records demonstrate that while Ramirez deposited $20,652.70 into his business account in March 2013, his monthly deposits dropped to $7,720.77 in June 2013, $1,000 in July 2013, $32.03 in August 2013, and zero in September 2013[5]. REO's repeated warnings regarding the lack of progress on the 14th Street project also jeopardized his future relationship with REO. It is no coincidence that Ramirez did not receive any additional REO contracts after it terminated him from the 14th Street project, and he must have known that his difficulties with the 14th Street project would undermine his ability to obtain more REO work.

Under these facts, the Labor Commissioner *has* established that Ramirez's representations turned fraudulent when REO first threatened to terminate the 14th Street project contract, which this court concludes was approximately June 1, 2013. With his cash flow dwindling, Ramirez's excuses for not paying Juarez's wages became knowingly deceitful. Ramirez intended for Juarez to rely on these representations (since he needed Juarez to continue to work on the 14th Street project to have

---

[5] Ramirez testified that he cashed six REO's checks during this period. These check amounts do not alter his downward business trend.

5

**MEMORANDUM AFTER TRIAL**

any chance of avoiding termination), and Juarez reasonably relied on them to his detriment.

By June 1, 2013, Ramirez had agreed to pay Juarez $120 per day. While Juarez's employment by Ramirez may have lasted from March 15, 2013 through September 13, 2013, it was not a binding commitment for a set length of time. Rather, if Ramirez had work for Juarez on a particular day, Ramirez would pay him $120 for that day's work. Juarez had the daily right to seek other work for any reason, and he believed that he could have found other work. While (as stated above) a defendant's intent to defraud under § 523(a)(2)(A) is typically measured at the inception of the debt, Juarez renewed his "employment contract" with Ramirez each day he worked. Thus, Ramirez's ongoing omissions satisfy § 523(a)(2)(A) element of intent. Had Ramirez been forthright regarding his status with REO, Juarez would have stopped working on the 14th Street project and sought work elsewhere. While Ramirez testified that he told Juarez to stop working at some point in time during the 14th Street project, the court does not find his testimony to be credible. Given a) Ramirez's concern that Juarez might file a wage complaint against him, b) his knowledge that Juarez had filed a wage complaint against a prior employer, and c) his inability to get paid for the 14th Street project, why would Ramirez first inform Juarez that he could not pay his wages but then allow Juarez to continue to labor at the 14th Street project? The court can only conclude that Ramirez never informed Juarez of his difficulties with REO on the 14th Street project, and never asked him to stop working.

The November 22nd Order establishes the Labor Commissioner's damages. This court may award damages under § 523(a)(2)(A) that arise or flow from the fraudulent conduct. *See Ghomeshi v. Sabban (In re Sabban)*, 600 F.3d 1219 (9th Cir. 2000). The November 22nd Order found that from June 1, 2013 through August 20, 2013, Juarez earned $8,640.00 but only received $2,700, leaving a balance due of $5,880.00. The Labor Commissioner also determined that Juarez was not compensated for 132 overtime hours from June 1, 2013 to August 20, 2013, at a rate of $22.50 per hour, for a total of $2,970.00. This court therefore awards the Labor Commissioner $8,850.00 in unpaid wages.

The November 22nd Order also awarded Juarez liquidated damages under California Labor Code § 1194.2(a) due to Ramirez's failure to pay at least the minimum wage (then $8.00/hour) for

6

**MEMORANDUM AFTER TRIAL**

Juarez's uncompensated time. This Labor Code section provides liquidated damages based on "actual harm." These damages also arise from Ramirez's fraud. *See Cohen v. de la Cruz*, 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998); *Ghomeshi v. Sabban (In re Sabban)*, 600 F.3d 1219 (9th Cir. 2000). During the period in question, Juarez worked 8 hours a day for 72 days, amounting to 576 hours. He was paid for 337.5 of these hours, leaving 238.5 unpaid hours of work. Plaintiff is therefore entitled to $1,908.00 in liquidated damages.

The November 22nd Order also awarded Juarez $3,937.50 as a penalty under Labor Code §§ 202 and 203. Under these code sections, Ramirez was required to fully pay Juarez's wages within three days of his termination. The November 22nd Order found that Ramirez "willfully" failed to pay these wages within that time period. Under Labor Code § 203, this willful failure authorized the Labor Commissioner to award Juarez 30 days of additional wages at a daily rate of $131.25. As the November 22nd Order notes, "'Willful' as used in Labor Code section 203 does not require malice or blamable conduct, but merely that the failure to pay was intentional. Unlike the criminal violations which may arise under the law for failure to pay wages, the civil penalty assessed under Labor Code Section 203 does not require that the action or omission be premeditated; merely that the action occurred and it was within the employer's control. (*Hale v. Morgan* (2978) 22 Cal.3d 388)." This court finds that these damages did not arise from Ramirez's fraud. This penalty is independent from Ramirez's deceptive omissions, and instead is premised on Ramirez's failure or inability to pay Juarez the amount due within three days of his termination.[6]

---

[6] During trial, the Labor Commissioner sought to introduce into evidence the testimony of two other laborers employed by Ramirez - Juan Campos and Gonzalo Martinez. Campos and Martinez uniformly testified that they, too, were not paid in full by Ramirez, and that Ramirez made the same excuses to them regarding why he could not pay them.

Ramirez objected to this testimony on the ground that it was a) not relevant under Federal Rule of Evidence 401, b) more prejudicial than probative under Federal Rule of Evidence 403, and c) improper character evidence under Federal Rules of Evidence 404, 405 and 608.

The court overrules Ramirez's objections. Federal Rule of Evidence 404(b)(1) generally states that "evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Under Federal Rule of Evidence 404(b)(2), however, evidence of a wrong may be admissible "for another purpose, such asa providing . . . intent . . . ." *See also Taylor v. Defalco (In re Defalco)*, 353 B.R. 449 (Bankr. W.D.Pa. 2006). Ramirez employed Campos and Martinez at the same time that he

7

MEMORANDUM AFTER TRIAL
Case: 15-04083   Doc# 40   Filed: 08/24/16   Entered: 08/26/16 13:45:21   Page 7 of 12

## B. The Embezzlement Claim for Relief Under § 523(a)(4)

The Labor Commissioner asserts that the funds Ramirez received from REO were owed to Juarez and his fellow employees, and that Ramirez's failure to pay wages constituted non-dischargeable embezzlement under § 523(a)(4). Embezzlement requires evidence that 1) property was rightfully in the possession of a nonowner and 2) the nonowner appropriated the property to a use other than which it was entrusted, under circumstances indicating fraud. *In re Wada*, 210 B.R. 572, 576 (B.A.P. 9th Cir. 1992). The Labor Commissioner must demonstrate these elements by a preponderance of the evidence.

The Labor Commissioner has not satisfied his burden of proof on this claim for relief. He has not provided this court with any legal analysis demonstrating that the REO payments were Juarez's property under California law.

## C. The Willful and Malicious Claim for Relief Under § 523(a)(6)

The Labor Commissioner finally argues that under *In re Jercich*, 238 F.3d 1202 (9th Cir. 2001), Ramirez's failure to pay Juarez's wages constituted "willful and malicious" conduct under § 523(a)(6). This court disagrees. While the facts in *Jercich* warranted the entry of a nondischargeable judgment, the general legal principles enunciated by the Ninth Circuit must be applied in context. When carefully scrutinized, the facts before this court fall short.

*Jercich* presented a series of appalling facts involving an employer's egregious failure to pay commissions due an employee. Jercich operated a real estate company which provided mortgage broker services. Jercich (through a wholly owned corporation) employed James Petralia to find investors to fund the company's real estate loans. Jercich agreed to pay Petralia a monthly base salary and commissions for each loan closed. Jercich failed to pay Petralia his commissions, and Petralia sued Jercich to recover these sums in Superior Court. After a bench trial, the Superior Court found that Jercich had the clear ability to pay Petralia, but instead opted to use the funds to pay for a wide variety of personal investments, including a horse ranch. The Superior Court held, among

---

employed Juarez. His statements to them regarding their wages are therefore admissible to prove Ramirez's intent to defraud. The court notes that there was sufficient evidence to establish Ramirez's intent to defraud without their testimony.

8

other things, that Jercich was liable for the unpaid commissions and his failure to pay was willful, deliberate and amounted to substantial oppression under California Civil Code § 3294, entitling Petralia to punitive damages.

Jercich thereafter filed a Chapter 7 bankruptcy, and Petralia filed an adversary proceeding under Bankruptcy Code § 523(a)(6) for a determination that his Superior Court judgment was non-dischargeable. The Bankruptcy Court determined that the Superior Court judgment was based on a breach of contract and not tortious conduct and held that the judgment was dischargeable. While the Bankruptcy Appellate Panel affirmed, the Ninth Circuit reversed.

Section 523(a)(6) excepts from discharge debts resulting from "willful and malicious injury by the debtor to another entity or the property of another entity." Conduct that is non-dischargeable under § 523(a)(6) typically amounts to an intentional tort under state law. *See Kawaauhau v. Geiger*, 523 U.S. 57, 60, 140 L.Ed.2d 90 (1998). Not surprisingly then, the *Jercich* court first noted that Jercich's intentional breach of contract by itself did not constitute willful and malicious conduct under § 523(a)(6). Instead, the Ninth Circuit held that a breach of contract must be accompanied by tortious conduct which results in a willful and malicious injury. *Jercich* at 1205. The Ninth Circuit then looked to California state law to determine whether Jercich's conduct was tortious. It concluded that given the egregious facts before it and California's strong public policy favoring the full and prompt payment of wages, Jercich's willful, oppressive, and (in fact) criminal failure to pay Petralia's wages was tortious. *Id*. at 1206-08. Having found the requisite tortious conduct, the *Jercich* court then determined that Jercich's conduct was willful and malicious under the Ninth Circuit's well established two part test. *Id*. at 1208.

While this court does not condone Ramirez's treatment of his itinerant laborers, his behavior did not sink to Jercich's depths. Ramirez's construction work barely sustained him and his family, and Ramirez testified without contradiction that he needed his girlfriend's financial assistance to support his family. His purchases of clothes and shoes for his family, a drum set for his son, and trips to Southern California fell far short of Jercich's luxurious lifestyle. Moreover, while Ramirez felt that he was "betrayed" when Juarez filed his wages complaint in August 2013, there is insufficient evidence that this sense of betrayal fueled Ramirez's ongoing failure to pay him.

9

MEMORANDUM AFTER TRIAL

Simply, Ramirez - unlike Jercich - lacked the funds to pay the wages owed. These circumstances do not merit a finding of tortious conduct.

The *Jercich* court's tort analysis, however, should not distract this court from a more direct application of § 523(a)(6). The Labor Commissioner need not rely on *Jercich's* public policy considerations to find the necessary tortious conduct, since this court has determined that Ramirez defrauded Juarez under § 523(a)(2).[7] Under § 523(a)(6), this court must look to state law to find tortious conduct, and the fraud elements of § 523(a)(2)(A) mirror the elements of common law fraud in California. *See Younie v. Gonya (In re Younie)*, 211 B.R. 367, 373-74 (B.A.P. 9th Cir. 1997); *Baldwin v. Kilpatrick (In re Baldwin)*, 245 B.R. 131, 134 (B.A.P. 9th Cir. 2000). The question remains whether Ramirez's conduct was willful and malicious.

Willful conduct requires evidence that Ramirez must have acted with a subjective motive to inflict injury, or with a belief that injury was substantially certain to result from his conduct. *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1143 (9th Cir. 2002). An injury is malicious under § 523(a)(6) if the debtor a) commits a wrongful act, b) done intentionally, c) which necessarily causes injury and d) the act is done without just cause or excuse. *In re Su*, 290 F.3d at 1147. Exceptions to discharge must be narrowly construed in favor of dischargeability. Vol. 4 Collier On Bankruptcy, ¶523.05 (Alan N. Resnick & Henry J. Sommer eds., 16th ed).

The Labor Commissioner has not established by a preponderance of the evidence that Ramirez's conduct was willful.[8] Ramirez wanted to pay Juarez and hoped that he could. The Labor Commissioner has not demonstrated to this court's satisfaction, however, that Juarez could do so without jeopardizing his own family's very modest lifestyle. While the Labor Commissioner asserts that Ramirez's termination of Juarez constituted some form of wrongful retaliation, the Labor Commissioner has not provided this court with any statutory authority or case law substantiating this

---

[7] Unlike under § 523(a)(2), this court may examine the entire course of the parties' relationship to find the requisite tortious conduct under § 523(a)(6). *See* cases cited in *In re Soares v. Lorono*, 2015 U.S.Dist. LEXIS 3967 *49-50 (N.D.Cal. Jan. 12, 2015).

[8] The court notes that while the October 22nd Order found that Ramirez "willfully" failed to pay Juarez, the Labor Commissioner applied an objective standard in making this finding.

claim. Moreover, when Juarez was terminated, Ramirez did not have any work for him. Accordingly, the Labor Commissioner is not entitled to relief under § 523(a)(6).

The Labor Commissioner shall prepare and submit an appropriate judgment.

**\* \* \* END OF ORDER \* \* \***

**COURT SERVICE LIST**

Recipients are ECF participants